IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| TERRY LEABO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 07-0839-REL-SSA |
| | ) | |
| MICHAEL ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

### ORDER DENYING PLAINTIFF'S MOTION FOR AN AWARD OF BENEFITS AND REMANDING FOR FURTHER CONSIDERATION

Plaintiff Terry Leabo seeks review of the final decision of
the Commissioner of Social Security denying plaintiff's
application for disability benefits under Titles II and XVI of
the Social Security Act ("the Act").  Plaintiff argues that the
ALJ erred in finding that plaintiff's mental retardation does not
meet a listed impairment.  I find that the ALJ erred in failing
to discuss the first requirement of Listing 12.05C, i.e., whether
plaintiff's mental retardation manifested itself initially before
the age of 22, and that the ALJ's finding with respect to the
third requirement of the listing appears to conflict with his
finding at the second step of the sequential analysis (the ALJ
found that plaintiff's verbal learning disorder and adjustment
disorder do not result in significant work-related limitation of
function, but simultaneously found that these impairments are
severe).  Therefore, plaintiff's motion for an award of benefits
will be denied, the decision of the Commissioner will be

reversed, and this case will be remanded for further consideration.

**I. BACKGROUND**

On September 3, 2002, plaintiff applied for a period of disability and disability insurance benefits alleging that he had been disabled since July 31, 2002. Plaintiff's disability stems from mental retardation. Plaintiff's application was denied initially. On June 10, 2004, a hearing was held before an Administrative Law Judge. On September 24, 2004, Administrative Law Judge Norman Buls found that plaintiff was not under a "disability" as defined in the Act. On October 22, 2007[1], the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

**II. STANDARD FOR JUDICIAL REVIEW**

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th

---

[1]The significant delay was caused by a misplaced administrative file.

Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of

3

a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.  Is the claimant performing substantial gainful activity?

>       Yes = not disabled.
>       No = go to next step.

2.  Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

>       No = not disabled.
>       Yes = go to next step.

3.  Does the impairment meet or equal a listed impairment in Appendix 1?

>       Yes = disabled.
>       No = go to next step.

4.  Does the impairment prevent the claimant from doing past relevant work?

>       No = not disabled.
>       Yes =  go to next step where burden shifts to Commissioner.

5.  Does the impairment prevent the claimant from doing any other work?

>       Yes = disabled.
>       No = not disabled.

## IV.  THE RECORD

The record consists of the testimony of plaintiff and his girl friend, Lauren Boyd; administrative records; and findings of Dr. David Hill and Dr. Ronald Holzschuh.

## A.  ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Disability Report**

On September 10, 2002, plaintiff completed a Disability Report (Tr. at 50-59).  He reported that his condition which limits his ability to work is:

> Do not get along with co-workers.  Slow - don't understand what they want me to do.  Do not understand what they want me to do.  They get mad at me.

When asked when his condition first bothered him, he reported October 1977.  He alleged he became unable to work because of his condition on March 22, 1980.  He claimed that he

5

worked fewer hours and made job-related changes, and he explained
as follows: "Co-workers would call me names, tease, make . . .
fun of me.  Call me stupid, make me upset."  Plaintiff reported
that he stopped working on February 7, 2002, because he did not
get along with others.

Plaintiff reported that he graduated from Pleasant Hill High
School in 1974 after attending special education classes.

**Daily Activities Questionnaire**

On September 25, 2002, plaintiff's girl friend, Lauren Boyd,
completed an "interested third party" daily activities
questionnaire (Tr. at 64-68).  Ms. Boyd reported that she had
known plaintiff for seven years and sees him every day.  She
reported that plaintiff has trouble keeping a job, and he seems
to want someone to take care of him as if he is afraid of every-
day life.  She had not noticed any changes in plaintiff's
condition during the seven years she'd known him.

Ms. Boyd reported that plaintiff gets along with her and his
family, but with her three children he acts like a child with
arguing and teasing.  "I have to tell them all to quiet down, he
acts just like a kid."

When asked to describe plaintiff's symptoms, Ms. Boyd
reported that he does not like people in control telling him what
to do, and he gets angry a lot. In order to alleviate his

6

symptoms, plaintiff takes a walk and smokes a cigarette. He does
not take any medications for his symptoms.

**Employer Questionnaire**

On October 8, 2002, the President of one of plaintiff's
former employers completed an Employer Questionnaire (Tr. at 77-
78). Plaintiff's job was to deliver ice products. He performed
his work "adequate" compare to other employees. He got along
adequately with co-workers and supervisors. Plaintiff needed an
"average" amount of supervision to carry out his duties. When
asked what type of difficulty plaintiff had in following verbal
or written instructions, the President wrote, "average". He
listed no special consideration given to plaintiff and reported
that plaintiff completed the job in the same manner as other
employees. Plaintiff's personal grooming and hygiene were
average. The President wrote that plaintiff was terminated
because he had too many absences or needed too much time off for
personal problems.

**Employer Questionnaire**

On October 19, 2002, James Green, the owner of Fairmount,
another of plaintiff's previous employers, completed an Employer
Questionnaire (Tr. at 79-80). Plaintiff worked as a tile helper.
His quality of work compared to other employees was "good". He
got along with other co-workers and supervisors "good". Mr.
Green listed no difficulties plaintiff had in following verbal or

7

written instructions.  He listed no special considerations given to plaintiff.  He reported that plaintiff completed the job in the same manner as other employees, he came to work regularly and on time, and he had good personal grooming and hygiene.

**Earnings Record**

The record establishes that plaintiff earned the following income from 1978 through 2004:

| Year | Income | Indexed |
|------|--------|---------|
| 1978 | $ 2,653.70 | $ 8,083.46 |
| 1979 | 1,879.31 | 5,264.09 |
| 1980 | 2,117.75 | 5,441.81 |
| 1981 | 893.88 | 2,086.86 |
| 1982 | 459.97 | 1,017.82 |
| 1983 | 137.69 | 290.53 |
| 1984 | 164.47 | 327.76 |
| 1985 | 1,495.07 | 2,857.70 |
| 1986 | 2,468.51 | 4,582.34 |
| 1987 | 1,636.87 | 2,856.39 |
| 1988 | 832.50 | 1,384.55 |
| 1989 | 1,799.53 | 2,878.85 |
| 1990 | 7,843.20 | 11,993.39 |
| 1991 | 3,745.37 | 5,521.45 |
| 1992 | 5,504.16 | 7,716.68 |
| 1993 | 8,396.09 | 11,670.71 |
| 1994 | 15,731.18 | 21,295.08 |
| 1995 | 15,791.50 | 20,552.90 |
| 1996 | 6,633.01 | 8,230.46 |

8

| | | |
|---|---:|---:|
| 1997 | 806.58 | 945.65 |
| 1998 | 4,520.23 | 5,036.03 |
| 1999 | 13,013.89 | 13,733.56 |
| 2000 | 19,238.30 | 19,238.30 |
| 2001 | 18,432.07 | 18,432.07 |
| 2002 | 6,493.12 | 6,493.12 |
| 2003 | 0.00 | 0.00 |
| 2004 | 0.00 | 0.00 |

(Tr. at 47-48).

**B.  *SUMMARY OF MEDICAL RECORDS***

On October 16, 2002, David O. Hill, Ph.D., completed a
Psychiatric Review Technique (Tr. at 88-101).  Dr. Hill found
that plaintiff's mental impairment is not severe.  He found that
plaintiff had a mild restriction of activities of daily living;
mild difficulties in maintaining social functioning; mild
difficulties in maintaining concentration, persistence, or pace;
and had no repeated episodes of decompensation.  In support of
his findings, Dr. Hill wrote:

> This is an initial concurrent claim for this 43 y/o man who
> is requesting benefits based on his allegation that he does
> not get along with co-workers and that he is slow and does
> not understand what employers want him to do.  He stated
> that he last worked 7/31/02 and that he stopped working
> because he did not get along with others.  The earnings
> record indicates that he has been gainfully employed since
> 1999 and the DO accepts the alleged onset.  The employer
> questionnaire indicates that his performance was average and
> that he got along with co-workers.  The employer stated that
> the claimant was terminated due to excess absences due to
> "personal problems".  The claimant's delf-description in the
> Claimant Questionnaire indicates that he has trouble getting

9

along with others.  The responses to the Questionnaire
indicate that he plays dominoes, reads want ads, drives, has
no difficulty leaving his home and he attends sporting
events.  The 3rd party indicates that the claimant has
trouble keeping a job because he does not understand things,
has a need for someone to take care of him and is "afraid of
everyday life".  The 3rd party states that he gets along
with her and her children although he acts immature.  She
stated that the claimant has trouble with reading some words
and with spelling.  She commented that he was in spec[ial]
ed[ucation] from grades 3-12.  But no school records were
found.[2]

The allegation that he has trouble reading some words and
trouble with spelling is considered partially credible since
he alleges these impairments.  However, this impairment does
not seem severe based on his work history, his ability to
read want ads, and his ability to complete parts of the
application.  The allegation that he has difficulty getting
along with others is considered partially credible since it
is alleged and he is described as immature in his behavior
toward his gf's [girl friend's] children.  However, he has a
successful work hx [history], the employer does not note
significant difficulty getting along with co-workers and the
3rd party notes also that he gets along with her and her
children.

The psych impairment is non-severe.

(Tr. at 101).

On July 19, 2004, plaintiff was examined by Ronald

Holzschuh, Ph.D. (Tr. at 102-106).  Dr. Holzschuh's report reads

as follows:

REASON FOR REFERRAL:
Ms. Geels requested intelligence testing and mental status
assessment to evaluate for mental ability to do work related
activities.  Mr. Leabo reported being disabled by becoming
frustrated, occasional back problems and cramps in his legs.

---

[2]The record does contain a school transcript which is
largely illegible, but does indicate that plaintiff attended
special education classes.

10

He has never been treated for mental health problems, takes
Ibuprofen and muscle relaxer.

<u>MENTAL STATUS</u>:
Mr. Leabo appears well developed well nourished with a tall
slender muscular physique.  He appears his stated age,
balding with fringe of graying hair.  He was comfortably
appropriately dressed for a very warm day and seemed well
groomed with good hygiene.  Locomotion was ordinary and he
manifested no unusual or idiosyncratic behaviors.  Social
demeanor was pleasant, cooperative and appropriately
interactive.  Speech intensity, rate and inflections were
all within normal limits with adequate production, some
spontaneity and focused on subjects presented.  Affect
expressed were smiles, and serious facial expressions where
appropriate.  He did have some difficulty discussing
emotions having to think about what kinds of things make him
angry coming up with "when the kids don't pick up their toys
or if I run out of cigarettes."  He could not give any
examples of feeling happy.  "I guess just being alive."  He
has fears about financial problems mentioning fearing being
kicked out of the trailer home that he rents.  He gets sad
about failing to pay some bills mentioning the cable being
recently turned off and also when a friend died.  Affect was
appropriate to thought content.  He reported he has been
living in a trailer renting to buy for the past three years
with his significant other of nine years, their two
children, eight and five years old and her 15-year-old son
who he reports is disabled with autism. He claimed having
two jobs that he liked working in a flower warehouse
delivering flowers to retail shops, he has recently been
working three or four days a week through temporary labor,
his last employment a day ago helping unload and load
furniture into a house.  He thinks he's unable to get a
permanent full-time job "because I've had such a bad work
record."  He claims leaving many different employments
because "I didn't like what I was doing."  Another time he
would say he gets frustrated on a job and quits.  He was
oriented in all spheres and there seemed to be no
indications of pathological thinking.  He denied
hallucinatory experiences and did not appear delusional.

<u>TEST ADMINISTERED</u>:
Wechsler Adult Intelligence Scale - III

<u>TEST RESULTS</u>:
Mr. Leabo scored a Verbal IQ of 68, a Performance IQ of 83
with a Full Scale Score of 73 placing him in the borderline

Case 4:07-cv-00839-REL   Document 15   Filed 07/07/08   Page 11 of 22

range of intellectual functioning.  The discrepancy between
Verbal and Performance IQ's is significant consistent with
his report of learning disability, and special education
through school.  All of [his] verbal subtests were deficient
with percentile ranks between the 2nd and 9th.  In contrast,
all performance subtests ranged between the 9th and 50th
percentile.  Thus vocabulary, abstract reasoning, arithmetic
skills, fund of information and common sense reasoning are
all regarded as in the mild mentally retarded range while
ability to identify missing elements, understanding abstract
designs, their relationships and construction were all
within the normal range while eye/hand motor coordination
and ability to sequence complex social relations in the
borderline range.  These scores are consistent with his
report of special education likely for learning
disabilities.

SUMMARY:
In summary, this 45-year-old man manifests no significant
mental health pathology but clearly has difficulties with
verbal expression and comprehension.  Perceptual learning
and thinking is in the low average range.  He is able to
remember and understand simple instructions, would have
difficulty with more detailed or complex unless supported
with visual aids.  Attention and concentration were poor for
verbal tasks but good for visual motor tasks.  This was also
true . . . of persistence.  Social demeanor was compliant,
cooperative and appropriately interactive.  It seems he
could adapt to changes in his environment and has minimal
skills to manage money in his own best interest.

DIAGNOSTIC IMPRESSION:
Verbal Learning Disorder
Adjustment Disorder with mixed emotions of anxiety and
     depression in reaction to learning disability

Dr. Holzschuh found that plaintiff had no limitation in his

ability to understand and remember short, simple instructions; no

limitation in his ability to carry out short, simple

instructions; a slight impairment in his ability to understand

and remember detailed instructions; a slight impairment in his

ability to carry out detailed instructions; and a moderate

Case 4:07-cv-00839-REL   Document 15   Filed 07/07/08   Page 12 of 22

impairment in his ability to make judgments on simple work-related decisions (Tr. at 104). Moderate was defined as still being able to function satisfactorily (Tr. at 104).

Dr. Holzschuh found that plaintiff had a slight impairment in his ability to interact appropriately with the public, no impairment in his ability to interact with supervisors, a slight impairment in his ability to interact appropriately with co-workers, a moderate impairment in his ability to respond appropriately to work pressures in a usual work setting, and a slight impairment in his ability to respond appropriately to changes in a routine work setting (Tr. at 105).

### C. *SUMMARY OF TESTIMONY*

During the June 10, 2004, hearing, plaintiff and his girl friend testified. Plaintiff waived his right to an attorney during the administrative hearing (Tr. at 117), but was represented by counsel in this federal appeal.

### 1. Plaintiff's testimony.

At the time of the hearing, plaintiff was divorced after a 14-year marriage (Tr. at 118-119, 122). Plaintiff was living in a mobile home with his girl friend, their children (ages five and six), and her son (Tr. at 119). Plaintiff drove his car to the hearing (Tr. at 119). He was receiving $560 per month in food stamps, and his girl friend's son was receiving SSI disability due to autism (Tr. at 119-120).

13

Plaintiff last worked the day before the administrative hearing (Tr. at 120). He had been working part time through a temporary service for the past four months (Tr. at 120). He was earning $7.00 per hour and was bringing home about $180 per week (Tr. at 120).

When asked why he believed he was disabled, plaintiff said, "Because I've been through so many jobs, I just can't keep a hold of them." (Tr. at 121). When asked why, he said, "I have no idea, sir. That's why I'm here to see if I can get some help on my problems I have. I'm a slow learner. That's why I went through special ed, because I was a slow learner." (Tr. at 121).

> Q. Well, once you learn a job, that being a slow learner doesn't matter, does it?
>
> A. I don't know.
>
> Q. Is there anything that you can't do?
>
> A. No.

(Tr. at 121).

Plaintiff insisted he had a disability because he was in special education classes from third grade through twelfth grade (Tr. at 122). He said he has gone from job to job to job, he does not get along with people on the job, he gets disgusted with things and takes it out on people he shouldn't, and then he just walks off (Tr. at 122).

Plaintiff testified that he gets up about 6:00 a.m., gets dressed, has a cup of coffee, gets ready to go to work (Tr. at

14

123). When asked if he enjoys temporary working, doing something different every day, plaintiff said he does not (Tr. at 123). The ALJ asked if plaintiff prefers to go to one place to work, plaintiff said:

> Yes and staying with it, yeah if I can get one. It's just hard right now, because there ain't hardly any jobs out there for me. I put in applications out, but nobody's ever called me on them. My girlfriend, she helps me fill out applications, because I can't fill them out that good.

(Tr. at 123). Plaintiff and his current girl friend had been together for the past eight years (Tr. at 123).

**2.  Lauren Boyd's testimony.**

Ms. Boyd testified that plaintiff seems to have a child's mind (Tr. at 124). He seems to be immature, and he goes from job to job to job (Tr. at 124).

## V.  *FINDINGS OF THE ALJ*

Administrative Law Judge Norman Buls entered his decision on September 24, 2004 (Tr. at 20-24).

Step one. The ALJ found that although plaintiff continued to work after his alleged onset date and at the time of the administrative hearing he was working three to four days per week as a temporary laborer earning about $180 per week, that income falls below the level generally considered substantial gainful employment (Tr. at 21).

Step two. Plaintiff's impairments include borderline intellectual functioning, verbal learning disorder, adjustment

15

disorder, verbal IQ of 68, performance IQ of 83, and full scale
IQ of 73, impairments which are severe (Tr. at 21).

Step three.  The ALJ found that plaintiff's impairment does
not meet or equal a listed impairment (Tr. at 21).  The ALJ noted
that mental retardation is a listed impairment when an individual
has a valid verbal, performance, or full scale IQ score of 60
through 70 and a physical or other mental impairment imposing an
additional and significant work-related limitation of function
(Tr. at 21).  He noted that plaintiff was diagnosed by Dr.
Holzschuh with a verbal IQ of 68 and borderline intellectual
functioning (Tr. at 21).  He was also diagnosed with a verbal
learning disorder and an adjustment disorder with mixed emotions
of anxiety and depression in reaction to learning disability (Tr.
at 21).  "Even allowing for such multiple impairments, the
evidence does not establish the additional and significant work-
related limitation of function contemplated under the . . .
listing.  It should be noted that Dr. Holzschuh found no greater
than 'moderate' psychological limitation in any area of
functioning, with 'moderate' defined in terms of the capacity to
function satisfactorily despite impairment." (Tr. at 21).

Step four.  The ALJ found that plaintiff has no physical
limitations (Tr. at 23).  His mental residual functional capacity
is such that he has mild restriction of activities of daily
living; mild difficulties in maintaining social functioning; mild

16

difficulties in maintaining concentration, persistence, or pace;
and no documented episodes of decompensation (Tr. at 23). He has
mild impairment in social or occupational functioning associated
with his mental/ emotional impairments (Tr. at 23). He remains
capable of understanding and remembering simple instructions, and
he has good attention/concentration for visual motor tasks (Tr.
at 23). With this residual functional capacity, plaintiff can
return to his past relevant work as a warehouse worker, a fast
food restaurant cook, or a delivery driver (Tr. at 23).

Therefore, plaintiff was found not disabled at the fourth
step of the sequential analysis.

## VI.   LISTING 12.05C

Plaintiff argues that the ALJ erred in denying plaintiff's
disability claim because plaintiff's condition meets the
requirements of Listing 12.05C.

20 C.F.R. pt. 404, subpt. P, app. 1 states in part as
follows:

12.00 Mental Disorders

A.   Introduction.  The evaluation of disability on the
basis of mental disorders requires documentation of a
medically determinable impairment(s), consideration of the
degree of limitation such impairment(s) may impose on your
ability to work, and consideration of whether these
limitations have lasted or are expected to last for a
continuous period of at least 12 months.  The listings for
mental disorders are arranged in nine diagnostic categories:
. . . mental retardation (12.05). . . .

The structure of the listing for mental retardation (12.05)
is different from that of the other mental disorders

17

listings.  Listing 12.05 contains an introductory paragraph
with the diagnostic description for mental retardation.  It
also contains four sets of criteria (paragraphs A through
D).  **If your impairment satisfies the diagnostic description
in the introductory paragraph and any one of the four sets
of criteria, we will find that your impairment meets the
listing.** Paragraphs A and B contain criteria that describe
disorders we consider severe enough to prevent your doing
any gainful activity without any additional assessment of
functional limitations.  **For paragraph C, we will assess the
degree of functional limitation the additional impairment(s)
imposes to determine if it significantly limits your
physical or mental ability to do basic work activities,
i.e., is a "severe" impairment(s), as defined in §§
404.1520(c) and 416.920(c).** If the additional impairment(s)
does not cause limitations that are "severe" as defined in
§§ 404.1520(c) and 416.920(c), we will not find that the
additional impairment(s) imposes "an additional and
significant work-related limitation of function," even if
you are unable to do your past work because of the unique
features of that work. . . .

     12.05 Mental retardation: Mental retardation refers to
significantly subaverage general intellectual functioning
with deficits in adaptive functioning initially manifested
during the developmental period; i.e., the evidence
demonstrates or supports onset of the impairment before age
22.

The required level of severity for this disorder is met when
the requirements in A, B, C, or D are satisfied.

     A.   Mental incapacity evidenced by dependence upon
others for personal needs (e.g., toileting, eating,
dressing, or bathing) and inability to follow directions,
such that the use of standardized measures of intellectual
functioning is precluded;

OR

     B.   A valid verbal, performance, or full scale IQ of
59 or less;

OR

     C.   A valid verbal, performance, or full scale IQ of
60 through 70 and a physical or other mental impairment

imposing an additional and significant work-related
limitation of function;

OR

     D.  A valid verbal, performance, or full scale IQ of
60 through 70, resulting in at least two of the following:

        1.   Marked restriction of activities of daily
living; or

        2.   Marked difficulties in maintaining social
functioning; or

        3.    Marked difficulties in maintaining
concentration, persistence, or pace; or

        4.   Repeated episodes of decompensation, each of
extended duration.

(emphasis added).

The Eighth Circuit, in <u>Maresh v. Barnhart</u>, 438 F.3d 897, 899

(8th Cir. 2006), held that the claimant must demonstrate or

support onset of the impairment before age 22.

This court agrees with the Commissioner that the
requirements in the introductory paragraph are mandatory.
The overall introduction to the mental disorders section
states: "Listing 12.05 contains an introductory paragraph
with the diagnostic description for mental retardation. It
also contains four sets of criteria (paragraphs A through
D). If your impairment satisfies the diagnostic description
in the introductory paragraph and any one of the four sets
of criteria, we will find that your impairment meets the
listing." . . . Under the plain language of the regulations,
a claimant must demonstrate or support onset of the
impairment before age 22. . . .

In sum, to meet Listing 12.05C, a claimant must show: (1) a
valid verbal, performance, or full scale IQ of 60 through
70; (2) an onset of the impairment before age 22; and (3) a
physical or other mental impairment imposing an additional
and significant work-related limitation of function.

19

In finding that plaintiff's impairment does not meet or equal a listed impairment, the ALJ wrote the following:

> Appendix 1 specifically provides for a finding of disabling mental retardation where an individual has a valid verbal, performance or full scale IQ score of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. Turning to the facts in this case, the July 2004 report by Dr. Holzschuh reflects a verbal IQ of 68, a performance score of 83, and a full scale IQ score of 73, with a diagnosis borderline intellectual functioning. Claimant also was diagnosed with a verbal learning disorder and an adjustment disorder with mixed emotions of anxiety and depression in reaction to learning disability. Even allowing for such multiple impairments, the evidence does not establish the additional and significant work-related limitation of function contemplated under the aforementioned listing. It should be noted that Dr. Holzschuh found no greater than "moderate" psychological limitation in any area of functioning, with " moderate" defined in terms of the capacity to function satisfactorily despite impairment.

(Tr. at 21).

The ALJ did not address the requirement that plaintiff show that his mental retardation manifested itself initially before the age of 22.

In Maresh v. Barnhart, 438 F.3d at 900, the court observed that Maresh was in special education classes until the ninth grade when he dropped out of school, and he exhibited deficits in adaptive functioning at a young age when he had frequent fights with other children, and therefore that he had established the first requirement of Listing 12.05C. In this case, however, plaintiff actually graduated from high school and was able to engage in full-time employment for many years. Although he

Case 4:07-cv-00839-REL   Document 15   Filed 07/07/08   Page 20 of 22

testified he was unable to get along with others, his former employers rated his performance either good or adequate, including his ability to get along with co-workers and supervisors.

Because the ALJ did not discuss this requirement prior to finding that plaintiff's condition does not meet or equal Listing 12.05C, and because the record does not clearly establish the existence or absence of this requirement, the case must be remanded for further consideration.

In discussing the third requirement for Listing 12.05C, i.e., the existence of a physical or other mental impairment imposing an additional and significant work-related limitation of function, the ALJ noted that plaintiff's verbal learning disorder and adjustment disorder do not satisfy the requirement because Dr. Holzschuh found that plaintiff is only moderately impaired by these conditions. However, plaintiff correctly notes that the ALJ found at step two of the sequential analysis that plaintiff's "severe" impairments include verbal learning disorder and adjustment disorder.

On remand, the Commissioner is directed to evaluate this third requirement and explain what appear to be conflicting findings in the original order.

## VII. CONCLUSIONS

Based on all of the above, I find that the ALJ's finding that plaintiff's condition does not meet Listing 12.05C is not supported by substantial evidence in the record because (1) the ALJ did not discuss the first requirement of the listing and the evidence in the record does not clearly establish the existence or absence of this requirement, and (2) the ALJ's findings with respect to the third requirement of the listing appear to conflict with his finding at step two that plaintiff's severe impairments include verbal learning disorder and adjustment disorder.  Therefore, it is

ORDERED that plaintiff's motion for an award of benefits is denied.  It is further

ORDERED that the decision of the Commissioner is reversed. It is further

ORDERED that this case is remanded for further consideration in accordance with sentence four of 42 U.S.C. § 405(g).


_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
July 7, 2008

Case 4:07-cv-00839-REL   Document 15   Filed 07/07/08   Page 22 of 22